IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ZERO DOWN SUPPLY CHAIN SOLUTIONS, INC., et al., <br><br> Plaintiffs, <br><br><br> vs. <br><br><br> GLOBAL TRANSPORTATION SOLUTIONS, INC., et al., <br><br> Defendants. | MEMORANDUM DECISION AND ORDER ON MOTIONS TO DISMISS <br><br><br><br> Case No. 2:07-CV-400 TC |

These matters come before the Court on the motions to dismiss of Defendants KeyBank, Sparrow & Kunz, and Mr. Shaw and Global Transportation Solutions, Inc. ("GTS") (collectively, the "Moving Defendants").  After carefully reviewing the parties' submissions and the governing law, and having heard oral argument, the Court will grant the motions to dismiss with respect to Plaintiffs' civil RICO claims under federal and Florida law and will deny the motions to dismiss in all other respects.

## I.  PROCEDURAL HISTORY

Plaintiffs Zero Down Supply Chain Solutions, Inc., a Florida corporation ("Zero Down Florida"), and Brad McBride filed their initial complaint in this action in June 2006 in the United

States District Court for the Southern District of Florida (the "Florida Court"), naming GTS, RFQ World, Inc. ("RFQ"), RKC Development ("RKC"), Key Bank of Utah, Global Transportation Management Solutions, Inc. ("GTMS"), Sparrow & Kunz, LLC, Shawn Shaw, Pat Cullinane, Thad Haderlie, and Valerio De Guevara as defendants.  In September 2006, Plaintiffs Zero Down Florida and Mr. McBride filed an amended complaint.

On June 11, 2007, the Florida Court entered an order finding that Zero Down Utah, LLC, a Utah limited liability company, was a necessary party to this action under Federal Rule of Civil Procedure 19(a).  The Florida Court also concluded that the interest of justice and the convenience of parties and witnesses necessitated transferring the case to this Court pursuant to 28 U.S.C. § 1404(a).

On January 31, 2008, this Court granted a motion for leave to amend their amended complaint.  The Second Amended Complaint (hereinafter, the "Complaint") was then filed, adding Zero Down Supply Chain Solutions, LLC, a Utah limited liability company ("Zero Down Utah"), and ZeroDownConsulting.Com, Inc., a Florida corporation ("Zero Down Consulting") as additional Plaintiffs and adding Datakab, LC as an additional Defendant.  The Moving Defendants then filed the motions to dismiss presently before the Court.  Mr. Haderlie, Mr. Guevara, Datakab, RKC, GTMS, Mr. Cullinane, and RFQ have filed answers to the Complaint.

## II.  THE SECOND AMENDED COMPLAINT

The following is a summary of the relevant allegations found in the Complaint.  In 2004, Mr. McBride formed Zero Down Florida, a transportation consulting company specializing in helping other companies renegotiate their pricing with transportation providers such as FedEx

and UPS.  Its customer base included Close to My Heart, Basic Research, Thales Navigation, and

MegaDyne Medical Instruments.  In February 2004, Mr. McBride hired Mr. Cullinane as the

Vice President of Operations and Mr. Shaw as the Vice President of Sales.

In October 2004, Mr. Cullinane and Mr. Shaw introduced Mr. McBride to Mr. Haderlie

as a potential developer for software that would automate the transportation process for Zero

Down Florida's customers.  In November 2004, Zero Down Florida engaged Mr. Haderlie to

develop the desired software by executing a written agreement between Zero Down Consulting, a

subsidiary of Zero Down Florida, and Datakab.  As lead programmer for Datakab, Mr. Guevara

worked on Zero Down's software.

Prior to July 2005, Mr. Haderlie, Mr. Guevara, Mr. Shaw, and Mr. Cullinane (the

"Individual Defendants") allegedly met and conspired to gain control of Zero Down and all of its

assets, including its clients, proprietary technologies, and money.  This plan was to be

accomplished by inducing Mr. McBride to open a Zero Down office in Utah and turnover control

of its daily operations to Mr. Haderlie and by taking advantage of this access and authority to

divert Zero Down's assets to competing businesses.  The Individual Defendants then recruited

KeyBank and Sparrow & Kunz to participate in the conspiracy.  Sparrow & Kunz was to act as

Zero Down's accountant and in that position would misrepresent accounting information to hide

the theft of Zero Down's assets.  KeyBank was to act as Zero Down's bank and in that position

would facilitate the illegal transfer of Zero Down's assets.  Accordingly, Mr. Haderlie and his

company (RKC), Mr. Guevara, Mr. Shaw and his company (GTS), Mr. Cullinane and his

company (RFQ), GTMS, KeyBank, and Sparrow & Kunz are referred to in the Complaint as the

3

"Conspirators."

Beginning in October 2005, the Individual Defendants made a number of misrepresentations about Mr. Haderlie's business experience, wealth, and relationships in order to induce Mr. McBride to open an office in Utah and give control to Mr. Haderlie.  These misrepresentations included the following: that he was a multi-millionaire due to his business acumen; that he made millions of dollars in cattle trading; that he had top-secret clearance from the United States government; that Northrup Grummand was one of his biggest clients; and that he created the Geico Insurance Lizard.  After a November 2005 trip to Utah where he met with the Individual Defendants, KeyBank, and Sparrow & Kunz, Mr. McBride decided to open a Utah office (Zero Down Utah), to transfer Zero Down's business accounts to KeyBank, to give Mr. Haderlie limited signatory authority on that account for normal company costs and expenses, and to redirect Zero Down invoices to Sparrow & Kunz.

Mr. Shaw, Mr. Cullinane, and Mr. Haderlie performed services for Zero Down (hereinafter referring collectively to Zero Down Florida, Zero Down Utah, and Zero Down Consulting) through consulting agreements with their respective companies (GTS, RFQ, and RKC).  These agreements provided for a monthly payment to GTS, RFQ, and RKC of $13,000, $7,000, and $10,000, respectively.  They also entitled each entity to 15% of Zero Down's profits as well as a reimbursement for cell phones in the amount $150 each.

The Complaint lists a number of fraudulent wire transfers, debit memos, and checks, made by the "Conspirators" between January and May of 2006, whereby they embezzled some $223,000 from Zero Down and Mr. McBride.  These transactions were allegedly fraudulent

because they were made without authority or in excess of the authority granted to the

Conspirators by Mr. McBride.  The proceeds of the fraudulent transactions were used to establish

and operate GTMS, which competes with Zero Down.  GTS, RFQ, and RKC are principals of

GTMS.  The fraudulent transactions were concealed by falsified accounting information.  The

Conspirators also diverted to GTMS amounts payable to Zero Down by its customers and

business partners.

In May 2006, Mr. McBride became suspicious of the activity on the KeyBank account.

Accordingly, he contacted Sparrow & Kunz and learned that Sparrow & Kunz had been signing

checks despite its lack of signatory authority.  Mr. McBride further learned that Sparrow & Kunz

had brought this fact to KeyBank's attention and was told that KeyBank would take care of it.

Mr. McBride contacted a KeyBank representative to indicate that he was investigating fraudulent

activity by his employees and that Mr. Haderlie no longer had any authority over the account.

Despite these instructions, Mr. Haderlie subsequently accessed the account to wire money,

change the username and password, and ultimately close the account.  Mr. Haderlie closed the

account in order to hide the Key Capture and Investment Sweep relationship between accounts

that allowed the Conspirators to transfer funds between accounts without detection by Mr.

McBride.  This unauthorized account access occurred as late as June 1, 2006.

The Conspirators also used interstate wires and the United States mails to divert Zero

Down's customers to themselves through a series of fraudulent misrepresentations made between

January and May of 2006.  Zero Down enjoyed a contractual relationship with Close to My Heart

and Basic Research to provide transportation consulting services.  In April 2006, Mr. Haderlie

falsely told Mr. McBride that Close to My Heart's legal department requested a release from its contract. Relying on this misrepresentation, Mr. McBride approved the release to Plaintiffs' detriment. Similarly, Mr. Shaw and Mr. Haderlie falsely told Mr. McBride that Basic Research wanted a release from its contractual obligations to Zero Down and would sue unless such a release was given. Mr. McBride likewise relied on these false statements in approving Basic Research's release. Mr. Shaw also fabricated an email that he claimed was sent by an individual in Basic Research's legal department, which email stated that Zero Down was not to have any further contact with Basic Research. Shortly after these contractual releases were approved, GTMS contracted with Close to My Heart and Basic Research to provide the same services on the same terms as those previously provided by Zero Down.

Mr. Haderlie and Mr. Shaw also falsely represented to Cost Recovery Services and Sportsman's Warehouse (potential Zero Down clients) and Atto Solutions (Zero Down's business partner) that Zero Down had gone out of business. These misrepresentations were made to divert these business relationships to GTMS.

Despite paying RKC and Datakab some $65,000 to develop Zero Down's proprietary software and install it for Basic Research, the software was never delivered to Zero Down and the money paid was never refunded. Instead, the Conspirators, through GTMS, use Zero Down's software to compete against it.

On May 6, 2006, after successfully diverting Zero Down's money, customers, and proprietary technology to themselves, Mr. Haderlie, Mr. Shaw, and Mr. Cullinane terminated their and their entities' relationships with Zero Down. Mr. McBride and Zero Down Florida

brought suit shortly thereafter.

In the Complaint, Plaintiffs allege twenty-four causes of action against Defendants including claims for (1) federal RICO violations (Claims 1-3), (2) Florida RICO violations (Claims 4-6), (3) civil conspiracy (Claim 7), (4) breach of contract (Claims 8-10), (5) tortious interference (Claims 11-14), (6) conversion (Claim 15), (7) violation of the Federal Computer Fraud and Abuse Act (Claim 16), (8) unfair competition (Claim 17), (9) trade secret misappropriation (Claim 18), (10) injunctive relief (Claim 19), (11) breach of fiduciary duty (Claim 20), (12) intentional and fraudulent misrepresentation (Claim 21), (13) unjust enrichment (Claim 22), and (14) negligence (Claims 23 and 24).

### III.  DISCUSSION

The Moving Defendants each ask the Court to dismiss Plaintiffs' federal RICO and Federal Computer Fraud and Abuse Act claims.  KeyBank and Sparrow & Kunz also seek dismissal of Plaintiffs' Florida RICO claims and Plaintiffs' claims for tortious interference and conversion.  KeyBank alone moves to dismiss part of Plaintiffs' negligence claim.  Sparrow & Kunz alone moves to dismiss Plaintiffs' claims for civil conspiracy, intentional and fraudulent misrepresentation, unfair competition, trade secret misappropriation, and injunctive relief.  For purposes of convenience, the Court's analysis will proceed by cause of action.

A.  Standard of Review

In considering a motion to dismiss under Rule 12(b)(6), "[a]ll well-pleaded factual allegations, as distinguished from conclusory allegations, must be taken as true" and viewed in

the light most favorable to the nonmoving party.[1]  Plaintiff must provide "enough facts to state a

claim to relief that is plausible on its face."[2]  In other words, "the complaint must give the court

reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for

*these* claims."[3]  "The court's function on a Rule 12(b)(6) motion is not to weigh potential

evidence that the parties might present at trial, but to assess whether the plaintiff's complaint

alone is legally sufficient to state a claim for which relief may be granted."[4]

   B.  Governing Law

   As a preliminary matter, there is some debate as to the appropriate law to apply to

Plaintiffs' federal claims in light of the fact that the case was transferred from the Florida Court.

Where a change of venue occurs, a transferee district court sitting in diversity is obligated to

apply the law of the transferor court.[5]  However, where jurisdiction is based on a federal

question, a federal district court is obligated to apply the law of the circuit in which it sits, unless

the issue is one of "geographically non-uniform" federal law.[6]  A federal law is geographically

---

[1]*Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002) (quoting *Swanson v. Bixler*, 750 F.2d 810, 813 (10th Cir. 1984)).

[2]*Bell Atlantic Corp. v. Twombly*, ___ U.S. ___, 127 S. Ct. 1955, 1974 (2007) (dismissing complaint where the plaintiffs "have not nudged their claims across the line from conceivable to plausible").

[3]*Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

[4]*Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991).

[5]*Olcott v. Delaware Flood Co.*, 76 F.3d 1538, 1544-45 (10th Cir. 1996).

[6]*Id.* at 1546 (quoting *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1127 (7th Cir. 1993)).

non-uniform where Congress specifically intended that the application of the law depend on the "geographic location of the events giving rise to the litigation."[7]

In this case, the Moving Defendants have given no indication that either the Racketeer Influenced and Corrupt Organizations Act or the Federal Computer Fraud and Abuse Act are geographically non-uniform.  Accordingly, the Court will apply Tenth Circuit law to Plaintiffs' federal claims.

C.  Federal RICO

Section 1962 of the Racketeer Influenced and Corrupt Organizations Act (RICO) contains three substantive provisions—subsections (a), (b), and (c)—that outlaw "the use of income derived from a 'pattern of racketeering activity' to acquire an interest in or establish an enterprise engaged in or affecting interstate commerce; the acquisition or maintenance of any interest in an enterprise 'through' a pattern of racketeering activity; [and] conducting or participating in the conduct of an enterprise through a pattern of racketeering activity."[8]  Subsection (d) of § 1962 prohibits conspiring to violate any of these subsections.  In Claims 1 and 2, Plaintiffs allege that Defendants committed substantive violations under subsections (a), (b), and ©.  In Claim 3, Plaintiffs allege that Defendants conspired in violation of subsection (d).

In order to plead and prove their civil RICO claims, substantive and conspiratorial, Plaintiffs' must establish a pattern of racketeering activity.[9]  Under the RICO definition,

---

[7]*Id.* (quoting *Eckstein*, 8 F.3d at 1126).

[8]*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 482-83 (1985).

[9]"The elements of a [substantive] civil RICO claim are (1) investment in, control of, or conduct of (2) an enterprise (3) through a pattern (4) of racketeering activity."  *Tal v. Hogan*, 453

"racketeering activity" includes "any act which is indictable" under the federal laws listed in §

1961(1), specifically including 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), 1344 (bank

fraud), and 2314 (interstate transportation of stolen property).[10]  "These underlying acts are

referred to as predicate acts, because they form the basis for liability under RICO."[11]

A "pattern" of racketeering activity requires at least two acts of racketeering activity in a

ten-year period.[12]  "However, because 'RICO is not aimed at the isolated offender,' proof of two

or more predicate acts are not sufficient to prove a pattern unless there is a relationship between

the predicate acts and a threat of continuing activity."[13]  At issue here is whether Plaintiffs have

sufficiently alleged predicate acts that demonstrate a threat of continuing criminal activity.

A plaintiff may demonstrate a threat of continuing activity by establishing either closed-

ended or open-ended continuity.[14]

> A party alleging a RICO violation may demonstrate continuity over a closed
> period by proving a series of related predicates extending over a substantial period
> of time.  Predicate acts extending over a few weeks or months are insufficient to
> show closed-ended continuity.  Open-ended continuity depends upon the facts of

---

F.3d 1244, 1261 (10th Cir. 2006).  A defendant is liable for RICO conspiracy where it is proven
that he "(1) by knowing about and agreeing to facilitate the commission of two or more acts (2)
constituting a pattern (3) of racketeering activity (4) participates in (5) an enterprise (6) the
activities of which affect interstate or foreign commerce."  *United States v. Smith*, 413 F.3d 1253,
1266 (10th Cir. 2005).

[10]18 U.S.C. § 1961(1).

[11]*Tal*, 453 F.3d at 1262.

[12]18 U.S.C. § 1961(5).

[13]*Tal*, 453 F.3d at 1267-68.

[14]*H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 241 (1989).

each case, and may be established by showing that the predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit, or that the predicates are a regular way of conducting the defendant's ongoing legitimate business or the RICO enterprise.[15]

However, "[a] single scheme to accomplish one discrete goal, directed at a finite group of individuals, with no potential to extend to other persons or entities, rarely will suffice to establish a threat of continuing activity."[16]  For example, in *Boone v. Carlsbad Bancorporation*,[17] the Tenth Circuit upheld a district court's dismissal of a RICO claim where the plaintiffs accused the defendants of defrauding them out of the value of their stock by engaging in a number of predicate acts over a period of 23 months.[18]  The court held that the plaintiff's allegations involved a "closed-ended series of predicate acts constituting a single scheme (the transfer of debt) to accomplish a discrete goal (the merger) directed at a finite group of individuals (CNB shareholders) 'with no potential to extend to other persons or entities,'" and, therefore, did not satisfy the continuity test.[19]  The Tenth Circuit has similarly affirmed dismissals in other cases where the RICO allegations clearly involved a single scheme directed at a small number of

---

[15]*Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1543 (10th Cir. 1993) (citations omitted).

[16]*Erikson v. Farmers Group, Inc.*, 151 Fed. Appx. 672, 678 (10th Cir. 2005) (unpublished decision).

[17]972 F.2d 1545 (10th Cir. 1992).

[18]*Id.* at 1555-56.

[19]*Id.* at 1556 (quoting *Sil-Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1516 (10th Cir. 1990)).

victims to accomplish a discrete goal.[20]

Even assuming the truth of the allegations in the Complaint, this case involves a single scheme (to use fraudulent money transfers and mails) to accomplish a discreet goal (to steal Plaintiffs' business) directed at a finite group of individuals (Mr. McBride and his companies) with no potential to extend to other persons or entities. Plaintiffs claim that the Conspirators committed substantive and conspiratorial violations of RICO by stealing all of the assets of Plaintiffs' transportation consulting and technology company, including its clients, proprietary technology, and money. These actions occurred, at very most, over an eleven-month period, from July 2005 until June 1, 2006.[21] Plaintiffs allege that the Conspirators accomplished this by embezzling Plaintiffs' money via fraudulent transfers, interfering with Plaintiffs' business relationships, and stealing Plaintiffs' proprietary software and other trade secrets. When this diversion of assets and customers was complete, Plaintiffs allege that the Conspirators severed their relationship with Plaintiffs. Plaintiffs summarily allege that the Conspirators' conduct is a reflection of the way they do business—implying the potential for other victims. However, in light of the very specific nature of Zero Down's business—transportation consulting—the threat

---

[20]*Erikson*, 151 Fed. Appx. at 677-78 (finding no continuity where 46 acts of mail or wire fraud were part of single scheme directed at two victims); *Duran v. Carris*, 238 F.3d 1268, 1271 (10th Cir. 2001) (acts of bribery and extortion directed a single victim to accomplish single goal not sufficient to establish continuity); *Sil-Flo, Inc.*, 917 F.2d at 1516 (no continuity for predicate acts directed at one individual and related to bad business deal).

[21]However, the first misrepresentations relating to the Conspirators' attempt to convince Mr. McBride to open a Utah office were made in October 2005. Moreover, the fraudulent money transfers and fraudulent statements made in connection with stealing Plaintiffs' customers occurred between January and May of 2005. Thus, the period over which the alleged racketeering activity took place was more likely between four and eight months.

of continued criminal activity was, in reality, remote.  Plaintiffs further allege that the

Conspirators continue to provide transportation consulting services to the clients they diverted

from Plaintiffs and use Plaintiffs' trade secrets in doing so.  However, continuing to provide

transportation consulting services, even using Plaintiffs' trade secrets, does not constitute mail

fraud, wire fraud, bank fraud, or interstate transportation of stolen property.  Finally, Plaintiffs

allege that the Conspirators continue to fraudulently divert monies owed to Plaintiffs.  Although

this allegation comes closer to showing a threat of continued criminal activity, the alleged

"pattern" is still limited to a single scheme to steal Plaintiffs' business that has a definite end.

The Court finds that this is simply not a RICO case.  Plaintiffs have not alleged the type

of "long-term criminal activity" that RICO "was enacted to address."[22]  Therefore, the Court will

grant the Moving Defendants' motions to dismiss with respect to Plaintiffs' federal RICO claims

(Claims 1, 2, and 3).

D.  Florida RICO

In Claims 4, 5, and 6, Plaintiffs allege that the Conspirators violated Florida's Civil

Remedies for Criminal Practices Act (the "Florida RICO Act").  KeyBank and Sparrow & Kunz

contend that Plaintiffs' Florida RICO claims should be dismissed for the same reasons they seek

dismissal of Plaintiffs' federal RICO claims.

Section 772.103 of the Florida RICO Act provides civil causes of action that closely track

---

[22] *Boone*, 972 F.2d at 1556.

those provided under federal RICO.[23]  Interpretation of the Florida RICO Act "is informed by

case law interpreting the federal RICO statute . . . on which Chapter 772 is patterned."[24]

Similar to its federal counterpart, each section of the Florida RICO Act requires Plaintiffs

to prove a "pattern of criminal activity."[25]  The above analysis of the "pattern" element under

federal RICO "is equally applicable" to the "pattern" element under the Florida RICO Act.[26]

Thus, Plaintiffs' claims under the Florida RICO Act fail for the same reasons that their federal

RICO claims are deficient—they fail to allege conduct that constitutes a threat of continuing

criminal activity.  Therefore, the Court will grant the motions to dismiss of KeyBank and

Sparrow & Kunz with respect to Claims 4, 5, and 6.

E.  Federal Computer Fraud and Abuse Act

The Moving Defendants also contend that Plaintiffs have failed to properly plead their

claims under the Federal Computer Fraud and Abuse Act ("FCFAA").[27]  KeyBank, Mr. Shaw,

and GTS argue that claims under the FCFAA are based in fraud and, therefore, must be pleaded

---

[23]Florida Statutes § 772.103 similarly renders it "unlawful for a person (1) to use or invest proceeds received through a pattern of criminal activity to establish or operate an enterprise, (2) to acquire or maintain an interest in or control of an enterprise through a pattern of criminal activity, (3) to conduct or participate in an enterprise through a pattern of criminal activity, or (4) to conspire to do any of the above criminal activities."  *Rogers v. Nacchio*, 241 Fed. Appx. 602, 607 (11th Cir. 2007) (unpublished decision).

[24]*Jackson v. Bellsouth Telecomm.*, 372 F.3d 1250, 1263 (11th Cir. 2004) (quoting *Jones v. Childers*, 18 F.3d 889, 910 (11th Cir. 1994)) (internal quotation marks omitted).

[25]Florida Statutes § 772.103(1)-(4).

[26]*Jackson*, 372 F.3d at 1263-1269 (applying federal "pattern" analysis in upholding dismissal of Florida RICO claim based on failure to plead continuity).

[27]18 U.S.C. § 1030.

with particularity.  Sparrow & Kunz argues that Plaintiffs merely label their claims.

The FCFAA is primarily a criminal statute, but also provides a civil cause of action to "[a]ny person who suffers damage or loss by reason of a violation" of 18 U.S.C. § 1030.[28]  In Claim 16, Plaintiffs assert that the Conspirators violated the following provisions of § 1030:

(a) Whoever

. . . .

(2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains

(A) information contained in a financial record of a financial institution . . . .;

(B) information from any department or agency of the United States; or

© information from any protected computer if the conduct involved an interstate or foreign communication;

. . . .

(4) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period.

(5)(A)(I) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;

(ii) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or

_____

[28] *Id.* at § 1030(g).

> > (iii) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage; and
>
> > (B) by conduct described in clause (I), (ii), or (iii) of subparagraph (A), caused (or, in the case of an attempted offense, would, if completed, have caused)
>
> > > (I) loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value. . . . .
>
> . . . .
>
> shall be punished as provided in subsection © of this section.

A "protected computer" is defined in § 1030 as "a computer (A) exclusively for the use of a financial institution or the United States government . . .; or (B) which is used in interstate or foreign commerce or communication . . . .[29]

The Moving Defendants have cited no case law, nor does the text of the statute itself suggest, that a claim under the FCFAA requires pleading with particularity. Only one of the subsections on which the Complaint relies even mentions fraudulent conduct, and then only an intent to defraud, which may be pleaded generally.[30] Accordingly, the Court finds that notice pleading is sufficient with regard to Plaintiffs' FCFAA claims.

---

[29] *Id.* at § 1030(e)(2)(A)-(B).

[30] *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997) ("True to the rule's straightforward language, this court has held that Rule 9(b) requires only the identification of the circumstances constituting fraud, and that it does not require any particularity in connection with an averment of intent, knowledge, or condition of mind.").

Plaintiffs plead a plausible claim to relief against the Moving Defendants.  The Complaint alleges that the Conspirators, without authorization or in excess of their authorization, (1) accessed Plaintiffs' online bank account, changed the user name and password, and obtained and falsely manipulated financial information that they used to divert Plaintiffs' assets; (2) accessed Plaintiffs' protected computer system with intent to defraud, obtained Plaintiffs' confidential financial and business information, and installed at least two malicious software programs that allowed them remote access to Plaintiffs' protected computer system; and (3) caused Plaintiffs' in excess of $5,000 damage in one year as a result of these actions.  Of course, these are only allegations, which Plaintiffs will ultimately have the burden of proving through the course of this litigation.  However, the Moving Defendants have not met their burden of showing that Plaintiffs have not stated a claim for relief under the FCFAA in the Complaint.  Accordingly, the Court will deny the motions to dismiss with respect to Plaintiffs' FCFAA claims.

F.  State Law Claims

KeyBank and Sparrow & Kunz also challenge a number of the state claims against them. Sparrow & Kunz's challenges are primarily related to the allegations surrounding Plaintiffs' civil conspiracy claim.  KeyBank makes two additional arguments regarding Plaintiffs' claims for conversion and negligence.

1.  Civil Conspiracy

Sparrow and Kunz argues that Plaintiffs' claim for civil conspiracy (Claim 7) should be dismissed for failure to plead with particularity because it is based on an underlying tort of fraud.

Utah has expressly sanctioned a cause of action for civil conspiracy under common law

comprised of the following elements: "(1) a combination of two or more persons, (2) an object to

be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more

unlawful, overt acts, and (5) damages as a proximate result thereof."[31]  The fourth element is of

particular note as it requires a civil conspiracy plaintiff to prove that one of the conspirators

actually committed an unlawful act—referred to as the underlying tort.[32]  Where a civil

conspiracy is established under the common law, each member of the conspiracy is liable for the

acts of his or her coconspirators.[33]

  As a general rule, civil conspiracy "is not one of the listed causes of action which must

meet the requirements of Rule 9(b)."[34]  However, where the unlawful act underlying the civil

conspiracy is a fraud-based tort, both the underlying tort and the conspiracy claim must be

pleaded with particularity.[35]

  In the Complaint, Plaintiffs allege that the Conspirators conspired to commit a number of

---

[31]*Israel Pagan Estate v. Cannon*, 746 P.2d 785, 790 (Utah Ct. App. 1987).

[32]*Jackson v. Volvo Trucks N. Am.*, 462 F.3d 1234, 1238 (10th Cir. 2006).

[33]"Parties to a civil conspiracy are joint tortfeasors; their liability is joint and several, for acts of coconspirators committed in furtherance of the common design or conspiracy."  15A C.J.S. *Conspiracy* § 21.  The parties have not cited, nor has further research revealed, a Utah decision considering the scope of a conspirator's liability for his or her coconspirator's torts. However, in recognizing a common law civil conspiracy cause of action, the Utah Court of Appeals adopted the elements of civil conspiracy from cases that relied on the exposition of civil conspiracy found in Corpus Juris Secundum.  *Cannon*, 746 P.2d at 790 (citing *Citizen State Bank v. Gilmore*, 603 P.2d 605, 613 (Kan. 1979); *Duffy v. Butte Teachers' Union*, 541 P.2d 1199, 1202 (Mont. 1975)).

[34]*Lochhead v. Alacano*, 697 F. Supp. 406, 417 (D. Utah 1988).

[35]*See United States ex rel. Erickson v. Uintah Special Servs. Dist.*, 395 F. Supp. 2d 1088, 1100 (D. Utah 2005) (finding conspiracy claim based on fraud is subject to Rule 9(b)).

unlawful actions, including conversion, tortious interference with existing and prospective business relationships, trade secret misappropriation, computer fraud, wire fraud, bank fraud, mail fraud, unfair competition, and breach of fiduciary duty.  Notably, several of these alleged torts are not fraud based and, therefore, do not require a heightened standard of pleading. Accordingly, even if the Court were to find that Plaintiffs have not pleaded their civil conspiracy claims with requisite particularity with regard to the fraud based claims, Plaintiffs' civil conspiracy claim need not be dismissed to the extent it is based on non-fraud torts.

The Court finds that Plaintiffs have sufficiently pleaded their civil conspiracy claim and will, therefore, deny the motions to dismiss with regard thereto.  In the Complaint, Plaintiffs allege that Mr. Haderlie, Mr. Guevara, Mr. Shaw, and Mr. Cullinane agreed to a course of conduct whereby they would gain control of Plaintiffs' transportation consulting business.  This scheme called for inducing Plaintiffs to open an office in Utah and repose control of Zero Down's day-to-day business operations in Mr. Haderlie along with significant authority over the business and its assets.  Through a series of misrepresentations and by virtue of this control, they would then divert Plaintiffs' funds, customers, and technology to their competing business (GTMS).  Plaintiffs allege that Sparrow & Kunz agreed to facilitate the conspiracy in its role as Zero Down's accountant by distorting and falsifying accounting data, thereby hiding the diversion of Zero Down's asserts.  Plaintiffs also allege conduct engaged in by Sparrow & Kunz that is consistent with this agreement, including improperly recording or not recording transactions in Zero Down's accounting records, forging Mr. McBride's signature on incorporation documents filed with the State of Utah, and signing checks without signatory

authority.  Thus, the Complaint sufficiently alleges a meeting of the minds between the

Conspirators, including Sparrow & Kunz, to accomplish a specific objective through a planned

course of conduct.  Plaintiffs also allege that they were damaged as a result of the conspiracy in

that they lost money, clients, and technology.  This leaves only the fourth element—one or more

unlawful, overt acts—which, as explained below, has also been properly pleaded.

Sparrow & Kunz challenges the pleading of Plaintiffs' claims for intentional and

fraudulent misrepresentation, tortious interference, conversion, unfair competition, trade secret

misappropriation, and injunctive relief.

### a.  Intentional and Fraudulent Misrepresentation

Sparrow & Kunz asks the Court to dismiss Plaintiffs' claim for intentional and fraudulent

misrepresentation, arguing that it has not been pleaded with sufficient particularity.

Under Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the

circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of

a person's mind may be alleged generally."  "Simply stated, a complaint must set forth the time,

place and contents of the false representations, the identity of the party making the false

statements and the consequences thereof."[36]

In Claim 21, Plaintiffs allege the Conspirators made a number of fraudulent

misrepresentations upon which Plaintiffs relied in deciding to establish a business presence in

Utah, open an account with KeyBank, give Mr. Haderlie control of daily operations and signatory

---

[36]*Schwartz*, 124 F.3d at 1252 (quoting *Lawrence Nat'l Bank v. Edmonds*, 924 F.2d 175, 180 (10th Cir. 1991)) (internal quotation marks omitted).

authority on the KeyBank account, allow clients to renege on contractual obligations, and take other detrimental actions.  In Claim 21 itself, Plaintiffs only generally refer to misrepresentations made by the "Conspirators," without specifying the specific person(s) who made the representations or the circumstances in which they were made.  However, the allegations found elsewhere in the Complaint, which were expressly incorporated into Claim 21, provide the required particularity with regard to at least some of the misrepresentations alleged in Claim 21.

For example, Plaintiffs allege in Claim 21 that "[t]he Conspirators fraudulently misrepresented to McBride and Zero Down that Close to My Heart and Basic Research wanted to be released from their contracts with Zero Down."[37]  Clearly, this allegation fails to specify who made the misrepresentation as well as when and where it was made.  However, earlier in the Complaint, Plaintiffs detail a number of misrepresentations made in connection with the termination of Plaintiffs' contractual relationships with Close to My Heart and Basic Research, including a conversation between Mr. Shaw and Mr. McBride on May 1, 2006, in which Mr. Shaw falsely told Mr. McBride that Basic Research was going to cancel its contract with Zero Down, consider suing Zero Down for harassment, set aside $2 million for litigation with Zero Down, and request a release from its contract with Zero down by close of business on May 1, 2006.[38]  The Complaint alleges that this information was false and that Mr. Shaw knew it was false when he represented it to Mr. McBride.  Mr. McBride relied on this and other misrepresentations in deciding to release Basic Research from its contract.  Thus, although not

---

[37]Docket No. 77, at ¶ 387(f).

[38]*Id.* at ¶ 120(b).

detailed in Claim 21, Plaintiffs have pleaded this misrepresentation with particularity.  That they

did not do so in the paragraphs listed under Claim 21 does not require dismissal under Rule

9(b).[39]  Thus, Plaintiffs have sufficiently pleaded a claim for fraudulent misrepresentation.

Sparrow & Kunz also argues that it is not sufficiently implicated in the alleged

misrepresentations in the Complaint.  However, even assuming that this is the case, Sparrow &

Kunz, as a member of the alleged conspiracy, is liable for the torts of its coconspirators, as

discussed above.  Accordingly, as Plaintiffs have sufficiently pleaded their civil conspiracy and

fraudulent misrepresentation claims, the Court will deny Sparrow & Kunz's motion to dismiss

with regard to Plaintiffs' fraudulent misrepresentation claim.

b.  Other Underlying Torts

Sparrow & Kunz also argues that Plaintiffs' claims for tortious interference, conversion,

unfair competition, trade secret misappropriation, and injunctive relief should be dismissed

because the Complaint does not specifically mention Sparrow & Kunz in the related allegations,

but rather refers to the "Conspirators" in general.  KeyBank makes the same argument with

respect to Plaintiffs' tortious interference claims.

As they are not fraud-based, none of these claims need to be pleaded with particularity

under Rule 9(b).  Accordingly, Plaintiffs general references to the "Conspirators" sufficiently

allege that each of the Conspirators, including Sparrow & Kunz and KeyBank, engaged in the

conduct alleged therein.  Sparrow & Kunz does not take issue with other aspects of Plaintiffs'

---

[39]*Schwartz*, 124 F.3d at 1253 ("A fair reading of the Complaint indicates that by cross-referencing as allowed by Rule 10(c), it sufficiently particularizes the circumstances constituting fraud to comply with Rule 9(b).").

pleading of these claims.  Moreover, as members of the conspiracy, Sparrow & Kunz and

KeyBank are liable for the torts of their coconspirators, as discussed above.  Accordingly, the

Court will deny their motions to dismiss with respect to Plaintiffs' claims for tortious

interference, conversion, unfair competition, trade secret misappropriation, and injunctive relief.

     2.  KeyBank's Arguments

       a. conversion

KeyBank contends that Plaintiffs' conversion claim should be dismissed because the

Complaint does not specifically identify a "fund . . . capable of separate identification."[40]

In *Utah v. Twitchell*,[41] the case on which KeyBank relies, the Utah Court of Appeals

considered the contours of a conversion claim where an insurance broker kept the insurance

premiums of his customers, which he was supposed to remit to the customers' insurance

providers.[42]  Instead of maintaining his clients' money in a trust fund as required by statute, the

broker instead maintained the money in a business or personal account and expended it for

personal purposes.[43]  The court found that the customer victims would be entitled to recover for

conversion as "[m]oney may be the subject of conversion when the party charged wrongfully

received it."[44]  From this, KeyBank argues that a claim for conversion of money may be stated

---

[40]Docket No. 139, at 8.

[41]*Utah v. Twitchell*, 832 F.2d 866 (Utah Ct. App. 1992).

[42]*Id.* at 869-70.

[43]*Id.* at 870 & n.4.

[44]*Id.* at  870.

only when a specifically identifiable fund is converted, apparently referring to the trust fund in

*Twitchell*.  However, a careful reading of the *Twitchell* case shows that the court's mention of the

trust fund was to show that the broker had complete control over his client's insurance premiums

rather than to identify the funds.[45]  The money in *Twitchell* was identified merely as the

customer's insurance premiums paid to the defendant broker.[46]

The Court finds that Plaintiffs have adequately identified the money allegedly converted

by the Conspirators.  In the Complaint, Plaintiffs allege a number of transactions through which

their money was converted.  Each of these transactions is identified by date, amount, and the

person or entity to which the money was transferred.  This sufficiently identifies the allegedly

converted money for purposes of a motion to dismiss.  Accordingly, the Court will deny

KeyBank's motion to dismiss with regard to the conversion claim.

b. negligence

KeyBank contends that Plaintiffs' negligence claim may only be pursued by its customer,

Zero Down Utah.  Plaintiffs do not disagree with KeyBank's assertion that Mr. McBride, Zero

Down Florida, and Zero Down Consulting were not KeyBank customers.  Rather, they argue that

KeyBank has a duty to a noncustomer where it undertakes to provide specific services to that

person or entity.

The Utah Court of Appeals recently held that "a bank does not owe a duty to a

---

[45]*Id.* at 870 n.4.

[46]*Id.* at 870.

noncustomer payee.'"[47]  In *Ramsey v. Hancock*, a depository bank deposited a number of checks

payable to the plaintiff, but were submitted for deposit by a third-party who forged the

endorsements.[48]  Examining a number of cases from other jurisdictions, the court held that the

depository bank owed no duty of care to the payee plaintiff.[49]  In so doing, the court distinguished

the case of *Arrow Industries v. Zions First National Bank*,[50] a Utah Supreme Court case, which

held that banks have a duty of good faith and ordinary care in all banking transactions.[51]  The

*Ramsey* court explained that *Arrow Industries* was distinguishable because in that case there was

a contractual relationship, albeit oral in nature, between the bank and the noncustomer, which

condition was absent in the *Ramsey* case.

The Court will deny KeyBank's motion to dismiss with respect to the negligence claims

of Mr. McBride, Zero Down Florida, and Zero Down Consulting because there are allegations in

the Complaint suggesting a relationship between KeyBank and Mr. McBride and his companies.

The Complaint alleges that Mr. McBride met with a KeyBank representative prior to transferring

Zero Down Florida's business accounts to a KeyBank account.  Additionally, Plaintiffs

consistently refer to Zero Down, which by definition includes each of the entity Plaintiffs, in their

negligence claim.  Accordingly, the Court will decline to dismiss the negligence claims of Mr.

---

[47]*Ramsey v. Hancock*, 79 P.3d 423, 428 (Utah Ct. App. 2003).

[48]*Id.* at 424.

[49]*Id.* at 428.

[50]767 P.2d 935 (Utah 1988).

[51]*Id.* at 938-39.

McBride, Zero Down Florida, and Zero Down Consulting at this time, allowing Plaintiffs to discover and submit evidence regarding their relationship with KeyBank.

## IV.  CONCLUSION

For the reasons set forth above, it is hereby

ORDERED that KeyBank of Utah's Motion to Dismiss Second Amended Complaint [Docket No. 89], the Motion to Dismiss All But Plaintiffs' Negligence Claim Against Defendant Sparrow & Kunz, LLC [Docket No. 95], and Shawn Shaw's and Global Transportation Solutions, Inc's Motion to Dismiss or Alternatively for a More Definite Statement [Docket No. 98] are GRANTED IN PART AND DENIED IN PART, as outlined above.

DATED October 16, 2008.

BY THE COURT:

_____

TENA CAMPBELL
Chief Judge

26